UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PATRICE YOUNGBLOOD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:22-cv-02822-SMY-GCS |
| | ) |
| MENARD, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

This matter is before the Court as a result of a discovery dispute between Plaintiff Patrice Youngblood ("Youngblood") and Defendant Menard, Inc. ("Menard"). On March 25, 2024, Plaintiff filed a Motion for Discovery to Adjudicate Claim of Attorney-Client Privilege. (Doc. 29). The Motion was referred to the undersigned from District Judge Staci M. Yandle on March 26, 2024. (Doc. 30). Defendant filed a Response to Plaintiff's Motion on April 29, 2024. (Doc. 31). On May 3, 2024, Plaintiff filed a Reply to Defendant's Response. (Doc. 32). The Court held a hearing on Plaintiff's Motion on July 9, 2024. (Doc. 34). For the reasons set forth below, Plaintiff's Motion for Discovery to Adjudicate Claim of Attorney-Client Privilege is **DENIED**. (Doc. 29).

### BACKGROUND

Plaintiff filed her case with this Court on December 6, 2022. (Doc. 1). In her Complaint, Plaintiff alleges that Defendant failed to properly secure the transition strip of the entry mat to the store, causing Plaintiff to fall and injure her shoulder. *Id*. at p. 2-3.

On January 9, 2023, Defendant answered Plaintiff's Complaint denying Plaintiff's allegations and asserted the affirmative defenses of contributory negligence and open and obvious condition. (Doc. 10, p. 1-3). Following the Court's entry of the parties' proposed scheduling order, Plaintiff and Defendant conducted discovery into the factual allegations of the case. (Doc. 17). This included deposing Michael Welker ("Welker"), Jody Houghland ("Houghland"), and Michael Marlo ("Marlo"). (Doc. 29, p. 1); (Doc. 32, Exh. 1). All three individuals work at the Menard's location where Plaintiff's injuries occurred. Welker is an assistant Store Manager. (Doc. 29, p. 1). Marlo serves as the Hardware Department Manager. (Doc. 32, Exh. 1, p. 4:14). Houghland is an hourly employee designated as a cashier *Id.*

On February 24, 2024, Houghland's deposition was taken on behalf of Plaintiff. (Doc. 31, Exh. 1). Houghland stated that she first learned about the present lawsuit from her store manager, Ashton Lucas ("Lucas"). *Id.* at p. 9:1-2. Lucas reportedly informed Houghland that she needed to see a lawyer because the store was being sued and that Welker would be in touch about going to see a lawyer to set a date for their depositions. *Id.* at p. 9:3-20. Thereafter, on Thursday February 15, 2024, Welker and Houghland traveled together to Attorney Christopher Koester's ("Koester") office. *Id.* at p. 9:21-10-1. Houghland asserted that the February 15th meeting was the only meeting she had with Mr. Koester, prior to her deposition being taken on February 22nd. *Id.* at p. 12:14-19.

Mr. Koester represents Defendant Menard, Inc. (Doc. 8). During Houghland's deposition, Koester asserted that he had established an attorney-client relationship with Houghland at the February 15th meeting. The following exchange concerning Koester's

claim of attorney-client privilege took place between Koester and Plaintiff's Counsel, Attorney Lanny Darr ("Darr") during Houghland's deposition:

> **Q. [MR. DARR]** Okay. And at that time were you told about the allegations of the lawsuit?
> **MR. KOESTER:** Objection. That invades the attorney/client privilege so don't answer that question.
> **MR. DARR:** Why would she be having attorney/client privilege with you?
> **MR. KOESTER:** Because -- because I'm her attorney. We established the attorney/client privilege even before the visit started and I do that in every single case.
> **MR. DARR:** Explain that to me because I'm really going to bring this issue up. There's no way you can have an attorney/client privilege with this -- with this witness.
> **MR. KOESTER:** I 100 percent disagree and I have done it for 20 years every single time. And you can certainly bring the question -- I mean, I don't know that -- are you going to ask her what I told her?
> **MR. DARR:** Yeah.
> **MR. KOESTER:** Okay. Do not answer those questions. We should bring it up later.
> **MR. DARR:** Okay.
> **MR. DARR: Q.** Ma'am, did you request that Mr. Koester be your attorney or did he approach you about the topic?
> **MR. KOESTER:** Objection. Invades the attorney/client privilege. Don't answer that question.
> **MR. DARR:** Okay.
> **MR. DARR: Q.** Ma'am, did you pay him any compensation to be your lawyer?
> **MR. KOESTER:** I will stipulate that she has not paid me personally any money, and that's not even relevant.
> **MR. DARR: Q.** Did you sign an agreement with him to be your lawyer?
> **MR. KOESTER**: I will stipulate that she has not signed any personal agreement with me personally individually as a non-Menard employee.
> **MR. DARR: Q.** Okay. Well, did you sign an agreement as a Menard employee?
> **MR. KOESTER:** I will stipulate she has not signed any agreements.
> **MR. DARR:** Okay.
> **MR. KOESTER:** Nor has ever -- nor has any manager or employee signed an attorney agreement with my firm in 20 years --
> **MR. DARR:** Okay.
> **MR. KOESTER:** -- hundreds of suits.
> **MR. DARR:** Okay.

(Doc. 31, Exh. 1, p. 10:4-12:12).

. . .

>    **MR. DARR:** I just – I just want to know if there was anything that you have learned about this lawsuit or the allegations of this lawsuit that you disagree with?
>    **MR. KOESTER:** Subject to the attorney/client privilege, you may answer, if you can. You can't say what I've told you or you have told me, but you may answer that question.

(Doc. 31, Exh. 1, p. 16:7-14).

On April 22, 2024, Marlo's deposition was taken on behalf of Plaintiff. (Doc. 32, Exh. 1). Marlo learned about the lawsuit from Welker in March or April 2024, when Welker informed Marlo that he needed to schedule a deposition. *Id.* at p. 5:17; 4:20-22. Marlo met with Koester at his office on April 12, 2024, prior to the deposition taking place. *Id.* at p. 2:15. A similar exchange between Mr. Darr, Mr. Koester, and Mr. Marlo took place regarding Koester's assertion of the attorney-client privilege with Marlo. The following is a relevant excerpt of that exchange:

>    **MR. DARR:** And are you claiming the attorney/client privilege with this witness?
>    **MR. KOESTER:** Yes. Yes.
>    **MR. DARR: Q.** Okay. So if I ask you questions about what you two discussed and things along those lines, you're going to follow his instructions and not answer my questions, correct?
>    **[MR. MARLO]: A.** Correct.
>    **[MR. DARR]: Q.** Okay. Let me ask you, did you ask Mr. Koester to be your attorney for this deposition or did he ask you?
>    **MR. KOESTER:** That also invades the attorney/client privilege.
>    **MR. DARR:** Okay.
>    **MR. DARR: Q.** Have you paid Mr. – anybody to be your attorney here today?
>    **[MR. MARLO]: A.** No.
>    **[MR. DARR]: Q.** Okay. Has anyone told you that they would pay for your attorney's services here today?

> **[MR. MARLO]: A.** No.
> **[MR. DARR]: Q.** Okay. Did you sign any agreements with regard to representation?
> **[MR. MARLO]: A.** No.
> **[MR. DARR]: Q.** When you went to the attorney's office on April 12th, was anyone with you?
> **[MR. MARLO]: A.** No.
> **[MR. DARR]: Q.** How long were you at the office on April 12th?
> **[MR. MARLO]: A.** I don't recall specifics, it was likely an hour.
> **[MR. DARR]: Q.** Okay. And that was up in Effingham?
> **[MR. MARLO]: A.** Yes.
> **[MR. DARR]: Q.** That took you about an hour to get up there?
> **[MR. MARLO]: A.** Yes.
> **[MR. DARR]: Q.** I assume it took you the same approximately an hour to get back?
> **[MR. MARLO]: A.** Yes.

(Doc. 32, Exh. 1, p. 2:17-4:9).

## LEGAL STANDARDS

Pursuant to Federal Rule of Evidence 501, federal courts presiding over a diversity action should look to state law, not federal law, in determining the existence and scope of the attorney-client privilege. *See* FED. R. EVID. 501. In this diversity case, Illinois law governs issues concerning the attorney-client privilege. *See, e.g.*, *Ansur American Insurance Company v. Borland*, Case No. 3:21-CV-59-SMY-MAB, 2023 WL 6976501, at *2 (S.D. Ill. Oct. 23, 2023); *Abbott Laboratories v. Alpha Therapeutic Corp.*, 200 F.R.D. 401, 404 (N.D. Ill. 2001); *Pyramid Controls, Inc. v. Siemens Indus. Automations, Inc.*, 176 F.R.D. 269, 271 (N.D. Ill. 1997); *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 272 (N.D. Ill. 2004).

The attorney-client privilege promotes open discussions between attorneys and their clients by preventing the disclosure of certain kinds of communications. *See Upjohn Co. v. United States*, 449 U.S. 383, 398 (1981). Under Illinois law, the party asserting the

privilege carries the burden of demonstrating that it applies. *See Pyramid*, 176 F.R.D. at 271. To meet this burden, the party asserting the privilege must show that "the statement originated in a legal capacity for the purpose of securing legal advice or services and remained confidential." *Equity Residential v. Kendall Risk Management, Inc.*, 246 F.R.D. 557, 563 (N.D. Ill. 2007) (quoting *Caremark, Inc. v. Affiliated Computer Services, Inc.*, 192 F.R.D. 263, 265 (N.D. Ill. 2000)). Such statements are protected only on a showing that they: (1) were made to an attorney acting in his or her legal capacity; (2) originated in a belief that they would not be disclosed; (3) involved legal advice; and (4) remained confidential. *See Consolidation Coal Co. v. Bucyrus-Erie Co.*, 432 N.E.2d 250, 257 (Ill. 1982). The protection extends to communications flowing from the client to the attorney, as well as from the attorney to the client. *See Equity Residential*, 246 F.R.D. at 563. Communications involving business instead of legal advice, however, are not protected. *See Square D Co. v. E.I. Electronics, Inc.*, 264 F.R.D. 385, 391 (N.D. Ill. 2009). Consistent with the broad discovery policy in the State of Illinois in favor of disclosure and ascertaining truth, the Illinois Supreme Court has made clear that the privilege is to be construed within the narrowest limits possible. *See Archer Daniels Midland Co. v. Koppers Co., Inc.*, 485 N.E.2d 1301, 1303 (Ill. App. Ct. 1st Dist. 1985); *Waste Management, Inc. v. International Surplus Lines Ins. Co.*, 579 N.E.2d 322, 326 (Ill. 1991).

## DISCUSSION

Plaintiff argues that defense counsel cannot serve as personal counsel for Welker, Houghland, or Marlo in connection with the present lawsuit because they are lower-level employees outside of Defendant Menard's corporate control group. (Doc. 29, p. 2-7).

Thus, Plaintiff believes the attorney-client privilege does not apply to the communications made between defense counsel and these three lower-level employees. *Id.* Moreover, Plaintiff is concerned that discovery would be impeded if the attorney-client privilege is applied to these communications, recalling the "zone of silence" concerns expressed by the Illinois Supreme Court in *Consolidation Coal Co. v. Bucyrus-Erie Company*. *Id.* at p. 5. (citing *Consolidation Coal Co. v. Bucyrus-Erie, Co.*, 432 N.E.2d 250, 257 (Ill. 1982)). Defendant Menard, on the other hand, argues that defense counsel established a permissible independent relationship with Houghland, Welker, and Marlo, noting the similarities between the present case and *Buckman v. Columbus-Cabrini Medical Center*. (Doc. 31, p. 1-5) (citing *Buckman v. Columbus-Cabrini Med. Ctr.*, 651 N.E.2d 767, 770-771 (Ill. App. Ct. 1st Dist. 1995)). Ultimately, the Court agrees with Defendant, finding that the attorney-client privilege shields the communications between defense counsel and Houghland, Welker, and Marlo.

As an initial matter, the corporate control group analysis is not applicable. When counsel represents a corporation, Illinois courts consider only members of the corporation's "control group" to be the client for the purpose of asserting the attorney-client privilege. *See, e.g., Caldwell v. Advocate Condell Medical Center*, 87 N.E.3d 1020, 1036 (Ill. App. Ct. 2nd Dist. 2017); *McChristian v. Brink*, 65 N.E.3d 428, 433-434 (Ill. App. Ct. 1st Dist. 2016); *Rounds v. Jackson Park Hosp. and Medical Center*, 745 N.E.2d 561, 566 (Ill. App. Ct. 1st Dist. 2001). A corporation's control group includes two types of employees: top management who have the ability to make final decisions for the corporation, as well as other corporate employees if, (1) the employee advises top management, (2) top

management would not normally make a decision in the employees' area of expertise without the employees' advice or opinion; and (3) the employees' advice or opinion actually formed the basis of the top management's final decision. *See Consolidation Coal*, 432 N.E.2d at 258. However, this framework is inapplicable[1] as defense counsel established an independent attorney-client relationship[2] with Houghland, Welker, and

---

[1] The contemnor-appellants in *Buckman* also put forward an argument for attorney-client privilege based on communications between the nurse as an insured and the hospital as insurer. 651 N.E.2d at 770. However, the court in *Buckman* did not base its decision on this framework. *Id.* at p. 770-771.

The insurer-insured extension of the attorney-client privilege applies when communication is made by the insured to the insurer or its agent for the dominant purpose of protecting the interests of the insured. *See, e.g., Pietro v. Marriot Senior Living Services, Inc.*, 810 N.E.2d 217, 226 (Ill. App. Ct. 1st Dist. 2004). "In this context, it has been stated that to extend the attorney-client privilege, the party asserting the privilege must prove: (1) the identity of the insured; (2) the identity of the insurance carrier; (3) the duty to defend the lawsuit; and (4) that the communication was made between the insured and an agent of the insurer." *Id.* (citing *Chicago Trust Co. v. Cook County Hosp.*, 698 N.E.2d 641, 649 (Ill. App. Ct. 1st Dist. 1998)).

The parties in this case did not assert the attorney-client privilege based on the existence of a relationship between the insurer and insured. Accordingly, the Court will not consider this as a basis for the existence of the attorney-client privilege.

[2] As Attorney Koester entered into a separate representation of Houghland, Welker, and Marlo, alongside his standing representation of Defendant Menard, Inc., Koester can be said to be pursuing a joint representation of these four clients. When two or more parties consult an attorney about mutual concerns, their confidential communications with the attorney may be privileged from disclosure to third parties. *See* IL. R. S. CT. RPC Rule 1.7, Comments 29-33; *Dexia Credit Local,* 231 F.R.D. at 272-73 (applying Illinois law).

A joint representation is distinct from the common interest doctrine. In a joint representation, the same lawyer represents two or more co-clients. However, under a common interest agreement, two or more separately represented clients contractually agree to share privileged information with each other and their respective lawyers. *See, e.g., Selby v. O'Dea*, 90 N.E.3d 1144, 1149-1150 (Ill. App. Ct. 1st Dist. 2017) (noting that although the common interest doctrine is rooted in the dual representation doctrine, the common interest doctrine can be applied even when the parties have separate attorneys).

Marlo prior to their depositions taking place.[3] This is precisely what occurred in *Buckman v. Columbus-Cabrini Medical Center*. 651 N.E.2d at 768-771. The Illinois Appellate Court did not apply the control-group analysis to such circumstances.

In *Buckman*, a nurse employed part time by the medical center defendant was subpoenaed for a deposition concerning her involvement with the decedent's care in the intensive care unit. 651 N.E.2d at 768. The medical center directed the nurse to their corporate counsel, who subsequently met with her and later appeared on her behalf at the deposition. *Id.* In response to questions raised to the nurse during her deposition as well as interrogatories directed to the medical center defendant, defense counsel asserted that the communications between him and the nurse were protected by the attorney-client privilege. *Id.* The Illinois Appellate Court noted that to establish an attorney-client privilege, the claimant must show that "the statement originated in a confidence that it would not be disclosed, was made to an attorney acting in his legal capacity for the purposes of securing legal advice or services and remained confidential." *Id.* at p. 771. Applying this test to the facts, the Appellate Court concluded the "circumstances

---

[3] This distinction was also discussed in *Valenti ex rel. Estate of Kolberg v. Rigolin*, No. 01 C 5914, 2002 WL 31415770, at *3 (N.D. Ill. Oct. 25, 2002). The *Valenti* Court noted that "[i]n *Buckman*, the court reviewed a communication which arose only *after* an attorney client relationship had already been established between a hospital nurse and an attorney, when the nurse specifically sought legal representation for her subpoenaed deposition and was referred by the hospital for that purpose to its attorney." *Id.* (emphasis added). As applicable to the *Valenti* case, the court determined that the hospital's attorney failed to establish that the nurse in that case had received legal advice or services at the time the statements seeking to be protected were made. *Id.* Thus, the court found *Buckman* distinguishable. *Id.* While this case is not controlling Illinois law, the Court finds that it serves as persuasive authority to support its interpretation of the holding in *Buckman*.

established that [the nurse] received legal advice and services." *Id.* The Appellate Court therefore found that the trial court erred in determining that the relevant communications between the medical center's corporate counsel and nurse were not protected by the attorney-client privilege. *Id.*

The facts here are nearly identical to those in *Buckman*. The record reveals that Houghland, Welker, and Marlo were informed by Defendant that the company was being sued and that each of them were being subpoenaed for a deposition. (Doc. 31, Exh. 1, p. 9:1-2); (Doc. 32, Exh. 1, p. 5:17; 4:20-22). Houghland and Welker then went to see Defendant's counsel on Thursday February 15, 2024, in preparation for their depositions. (Doc. 31, Exh. 1, p. 9:21-10:1). Marlo also had a meeting with defense counsel on April 12, 2024, prior to his deposition taking place. (Doc. 32, Exh. 1, p. 2:15). Each of these individuals sought out defense counsel for representation at their deposition. Thus, defense counsel was clearly providing the witnesses with a legal service. Further, given the mutual concerns each of the three witnesses shared with Menard in avoiding potential or actual liability in the underlying slip and fall case, the three witnesses had a reasonable expectation that their communications with counsel would remain confidential and not disclosed to outside third parties.

Plaintiff, however, cites to *United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO*, to argue that an alternative attorney-client privilege test should apply in instances where a claim of attorney-client privilege is made by the individual employees with corporate counsel. 119 F.3d 210 (2d

Cir. 1997); *see also* (Doc. 32, p. 1-2). Plaintiff believes that to prevail in such circumstances, the individuals must prove:

> (1) they approached corporate counsel for legal advice;
> (2) when approaching counsel, they made it clear they were seeking advice individually, not due to the corporate affiliation;
> (3) Counsel chose to confer with them in an individual capacity, even though it may present a conflict with the corporate client; and
> (4) That the substance of their conversation with counsel did not concern matters within the company or general affairs of the company.

(Doc. 32, p. 1-2). Having reviewed the facts of *International Brotherhood of Teamsters*, the Court finds that it is distinguishable from the instant case in one critical way. Namely, that the issue of joint representation was not at issue.

In *International Brotherhood of Teamsters*, appellant Jere B. Nash III ("Nash") served as manager for Ron Carey's ("Carey") 1996 re-election bid for the office of president of the Internal Brotherhood of Teamsters ("IBT"). 119 F.3d at 211. On February 4, 1997, following Carey's reelection as president of IBT, his opponent James Hoffa ("Hoffa"), Jr. lodged a formal protest with the Election Officer appointed by the United States District Court for the Southern District of New York. *Id.* at p. 212. Hoffa alleged that the Carey Campaign had engaged in impermissible fundraising activities. *Id.* IBT President Carey, on behalf of the Carey Campaign, authorized the law firm of Cohen, Weiss & Simons ("CWS") to cooperate fully with the investigation and provide the Election Officer with all necessary information. *Id.* Susan Davis ("Davis"), a partner with CWS, informed the Election Officer that Carey had decided to waive the Campaign's attorney-client privilege with respect to conversations Nash had with CWS attorneys as campaign manager. *Id.* Nash argued that he was entitled to assert a personal claim of attorney-client privilege

with respect to those conversations. *Id.* Nash did not dispute that the specific conversation at issue were limited to discussions concerning allegations made against the campaign. *Id.* at p. 212-213. Moreover, "at no point with his conversations with [CWS] did Nash seek, nor did [CWS] provide, any personal legal advice." *Id.* at p. 213. The Court in *International Brotherhood of Teamsters*, then went on to find that "any privilege that attaches to communications on corporate matters between the corporate employees and corporate counsel belongs to the corporation, not to the individual employee, and that employees generally may not prevent a corporation from waiving the attorney[-]client privilege arising from such communications." *Id.* at p. 215.

In this case, the three employees clearly entered into independent representation with Menard's Corporate Counsel. Marlo, Houghland, and Welker were all being deposed on behalf of Plaintiff to gather information about her accident at Menard's. Upon receiving such notification, they turned to Menard's corporate counsel. The three employees then formally established an independent attorney-client relationship with Menard's corporate counsel to secure guidance as to how they should proceed in response to the deposition requests. When the attorney-client relationship is established, the attachment of attorney-client privilege to communications is not controversial. This is unlike the situation in *International Brotherhood of Teamsters* where Nash was seeking to assert a personal attorney-client privilege for conversations he had with corporate counsel solely based on his relationship as an agent for the corporation.[4] Here, the three

---

[4] In I*nternational Brotherhood of Teamsters*, the Court began its analysis by identifying the attorney-client privilege issue, as follows: "Courts have been willing to allow corporate

employees are asserting the attorney-client privilege based on their own attorney-client relationship that they established with Koester independent of their relationship as Menard employees.

Additionally, unlike in *International Brotherhood of Teamsters*, there are no competing claims of privilege at stake. In *International Brotherhood of Teamsters*, Nash asserted the attorney-client privilege to protect communications made to corporate counsel. However, the privilege encapsulating Nash's communications with corporate counsel belonged to the campaign corporation. Accordingly, the Court found that the corporation had the ability to waive the privilege to cooperate with the campaign finance investigation taking place and that Nash could not assert a competing privilege claim against the campaign corporation. Such is not the case here. The claims of privilege made by Marlo, Houghland, and Welker are not competing with an assertion or waiver of privilege from Menard, Inc.

Given these distinctions, the Court finds Plaintiff's arguments for applying the alternative framework from *International Brotherhood of Teamsters* unpersuasive and will

---

employees to assert a *personal privilege* with respect to conversations with *corporate counsel*, despite the fact that the privilege generally belongs to the corporation, but only by meeting certain requirements that Nash simply cannot satisfy." 119 F.3d at 215 (emphasis added). The Court believes that this framing of the issue indicates that the test set out in *International Brotherhood of Teamsters* applies to circumstances where the individual employee has not established an independent attorney-client relationship with corporate counsel, but the employee rather is relying upon his or her relationship with the corporation as the basis for the privilege.

instead follow the precedent set out in *Buckman*.[5] Thus, the Court finds that the employees' conversations with counsel are shielded by the attorney-client privilege.

Plaintiff also asserts that defense counsel inappropriately solicited the representations of Houghland, Marlo, and Welker in violation of Rule 7.3 of the Illinois Rules of Professional Conduct. (Doc. 29, p. 7-18). Defendant contests Plaintiff's assertion that solicitation occurred, arguing that "there is no evidence that [defense] counsel solicited professional employment in violation of either subsection (a) or (b) of [Rule 7.3] of the Illinois Rules of Professional Conduct." (Doc. 31, p. 5). The Court agrees with Defendant's assessment of the record.

> Rule 7.3 of the Illinois Rules of Professional Conduct provides:
>
> (a) A lawyer shall not by in-person, live telephone or real-time electronic contact solicit professional employment when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain, unless the person contacted:
>     (1) is a lawyer; or
>     (2) has a family, close personal, or prior professional relationship with the lawyer.
> (b) A lawyer shall not solicit professional employment by written, recorded or electronic communication or by in-person, telephone or real-time electronic contact even when not otherwise prohibited by paragraph (a), if:
>     (1) the target of the solicitation has made known to the lawyer a desire not to be solicited by the lawyer; or
>     (2) the solicitation involves coercion, duress or harassment.

---

[5] Other than the *Buckman* decision, Illinois case law on the issue of joint representation in the corporate context is sparse. Cases like *Mueller Industries, Inc. v. Berkman*, 927 N.E.2d 794, 804 (Ill. App. Ct. 2nd Dist. 2010) (abrogated on other grounds by *People v. Radojcic*, 998 N.E.2d 1212, 1223-27 (Ill. 2013)) and *Janousek v. Slotky*, 980 N.E.2d 641, 652 (Ill. App. Ct. 1st Dist. 2012), concern the issue of dual representation – when the parties' interests are adverse. Such is not the case here, where the three witnesses and Menard share mutual interests and concerns.

IL. R. S. CT. RPC Rule 7.3. While Plaintiff argues that solicitation has taken place, Plaintiff has not pointed the Court to any specific facts that support this contention.[6] All that the Court can ascertain from the limited documentation submitted by the parties is that Houghland was informed of the lawsuit by store manager, Lucas, who informed her about the deposition and told her that she would need to see a lawyer. (Doc. 31, Exh. 1, p. 9:1-2). Lucas also informed Houghland that Welker would be in touch about going to see a lawyer. *Id.* at p. 9:3-20. Houghland and Welker then traveled together to meet with defense counsel on February 15, 2024. *Id.* at p. 9:21-10-1. Similarly, all we know about Marlo is that Welker informed him that he was also being subpoenaed for a deposition and that he needed to see an attorney. (Doc. 32, Exh. 1, p. 5:17; 4:20-22). Marlo then met with defense counsel on April 12, 2024, prior to his deposition. *Id.* at p. 2:15. This is insufficient for the Court to find that solicitation occurred. Plaintiff has failed to demonstrate any improper contact with the three witnesses or that defense counsel coerced the witnesses into allowing him to represent them.

Moreover, the cases Plaintiff cites to as factually analogous are distinct in several respects. First, Plaintiff relies on *In re Komar* to argue that "obtaining representation through a deponent's employer is impermissible solicitation." (Doc. 29, p. 8) (citing *In re Komar*, 532 N.E.2d 801, 809 (Ill. 1988)). However, key to that Court's holding was the fact that the attorney had a 25 percent ownership interest in the corporation that solicited clients. Thus, the Court reasoned:

---

[6] Plaintiff cited to testimony from Houghland's deposition to support her allegations that solicitation has taken place. (Doc. 29, Exh. 1, p. 10:1-13:3).

> It is of no matter that the complaint does not allege that the respondent personally participated in soliciting Midland's or Capital's customers. The complaint states that the respondent, through his ownership in Fiscal, owned a 25% interest in Midland; that part of the "services" Midland proposed to render its clients was "retaining counsel to determine the legal status [of the foreclosure action]"; that the respondent performed the legal services promoted in the solicitations; and that Midland compensated the respondent for his services. The complaint also alleged that the respondent provided the same services for Capital's customers as he did for Midland's. It is clearly alleged in practical effect that Midland and Capital were in part soliciting business in which the respondent would share and participate as "retained counsel" and that he was aware of the solicitations.

*Id.* at p. 806. Also critical to the Court's analysis was that the solicitations were false, misleading, deceptive, and coercive under the circumstances. *Id.* at 807-809. The Court further notes that the solicitations in question were initiated by the attorney. *Id.* at 803-804. No such facts exist in the instant case, and thus, *In re Komar* is not applicable.

Plaintiff also relies heavily on the *Aspgren*[7] case to argue that "informing potential deponents that they may need counsel and that litigation defense counsel will represent them without charge constitutes improper solicitation." (Doc. 29, p. 15) (citing *Aspgren v. Montgomery Ward & Co., Inc.*, No. 82 C 7277, 1984 WL 49011 (N.D. Ill. Nov. 19, 1984). However, in *Aspgren*, the law firm of Steptoe and Johnson ("Steptoe") reached out to the deponents personally and advised them that Steptoe would represent them free of charge. *See Aspgren*, 1984 WL 49011, at *1. Here, there is no evidence that Attorney Koester personally reached out to the deponents. Second, a concern in *Aspgren*, was that the

---

[7] The Court in *Aspgren* reached no conclusion about Steptoe's prior conduct. *Aspgren v. Montgomery Ward & Co., Inc.*, No. 82 C 7277, 1984 WL 49011, at *5 (N.D. Ill. Nov. 19, 1984). The Court noted that "[t]he evidence in the record is insufficient to conclude that Steptoe's presentation to the former employees constituted solicitation. The order merely protects the former employees from the dangers posed by potential solicitation in the future." *Id.*

deponents were former employees that could have ended up as plaintiffs in the same case. *Id.* Therefore, Steptoe agreeing to represent them in connection with their representation of defendant in the underlying case could have created a conflict of interest. *Id.* In this case, the three witnesses remain employees at Menard and have mutual interests and concerns in the present litigation. Thus, the conflict-of-interest concerns present in *Aspgren* are not present here.

Lastly, Plaintiff expressed concern about discovery in this case being obstructed by defense counsel's joint representation of Defendant Menard and the three employee witnesses. Despite Plaintiff's concern, discovery regarding the substantive allegations of the case does not appear to have been impaired. In fact, Houghland's deposition continued after defense counsel's objections asserting the attorney-client privilege. Houghland answered questions about whether she inspected the transition slip to the entry mat of the store, whether any part of the transition strip was loose or not, and whether she considered if a knee scooter could easily maneuver over the existing transition strip. (Doc. 31, Exh. 1, p. 19:15-23, 20:2-12, 25:14-26:4). Houghland's deposition goes on for fifty pages, and Plaintiff's counsel was openly able to query Houghland as to her knowledge of the circumstances surrounding Plaintiff's injury. *See generally*, (Doc. 31, Exh. 1).

Moreover, the only questions Plaintiff's counsel did not get answered concern defense counsel's mental impressions of the case, the forced disclosure of which violates

the work product doctrine. The work product doctrine[8], as codified at Rule 26(b)(3) of the Federal Rules of Civil Procedure provides that, "[o]rdinarily, a party may not discover *documents and tangible things* that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . ." FED. RUL. CIV. PROC. 26(b)(3) (emphasis added). Thus, there is an "intangible hole" in the work product doctrine. *Trydel Research Pty. Ltd., v. ITW Global Tire Repair, Inc.*, No. 21 C 4977, 2024 WL 2209674, at *3 (N.D. Ill. May 15, 2024). However, courts have recognized that this hole is addressed by the Supreme Court decision in *Hickman v. Taylor*, 329 U.S. 495 (1947). *See, e.g., In re Turkey Antitrust Litigation,* Case No. 19 C 8318, 2022 WL 797180, at *11 (N.D. Ill. Mar. 16, 2022) (stating that ". . . Rule 26(b)(3)'s codification of the doctrine has been recognized as only 'partial', leaving *Hickman*'s protections unscathed as applied to so called 'intangible' work product such as interviews."); *DSM Desotech, Inc. v. 3D Systems Corp.*, No. 08 C 1531, 2011 WL 117048, at *2 (N.D. Ill. Jan. 12, 2011) (citing *United States v. Deloitte LLP*, 610 F.3d 129, 136 (D.C. Cir. 2010) (stating that "*Hickman* provides work-product protection for intangible work product independent of Rule 26(b)(3)"). *See also Caremark, Inc. v. Affiliated*

---

[8] The work product doctrine is governed solely by federal law. *See, e.g., Dawson v. New York Life Ins. Co.*, 901 F. Supp. 1362, 1367 (N.D. Ill. 1995) (stating that "the work product doctrine is governed by a uniform federal standard even in diversity cases."). The work product doctrine serves to (1) protect an attorney or representative's thought processes and mental impressions, and (2) to limit the circumstances in which attorneys may "piggyback" on the factual investigation of their counterparts. *See Sandra T.E. v. South Berwyn School Dist. 100*, 600 F.3d 612, 621-622 (7th Cir. 2010). *See also Certain Underwriters at Lloyds v. Fidelity and Casualty Co. of New York*, No. 89 C 08746, 1997 WL 769467, at *3 (N.D. Ill. Dec. 9, 1997) (noting that the doctrine protects "the adversarial process by providing an environment of privacy in which a litigator may creatively develop strategies, legal theories and mental impressions outside the ordinary liberal realm of federal discovery provisions, thereby ensuring the opponent is unable to ride off the litigator's wits.") (citing *Hickman*, 329 U.S. at 394).

*Computer Services, Inc.*, 195 F.R.D. 610, 614 (N.D. Ill. 2000) (describing Rule 26(b)(3) as applying "only to tangibles and codif[ying] that portion of the *Hickman* opinion that relate to documents. *Hickman v. Taylor* and other common law developments also govern intangibles, such as interviews."). The Supreme Court in *Hickman* recognized that an attorney's work is reflected "in interviews, statements, memoranda, correspondence, briefs, *mental impressions*, personal beliefs, and countless other tangible and intangible ways . . . ." 329 U.S. 495, 511 (1947) (emphasis added). The Court reasoned that an attorney's mental impressions[9] were protected from discovery because if they were not, such impressions would remain unwritten. *Id.* This would cause inefficiencies and unfairness in the giving of legal advice and preparing cases for trial. *Id.*

During the motion hearing, Mr. Darr speculated that Mr. Koester and the three employee witnesses had developed a common theory of the case because each of the three employees used the phrase "it's common sense" during their depositions. Darr indicated that he would like to know how the phrase came about, what Koester discussed with the three employees regarding the slip and fall, whether Koester informed the three employees what position to take regarding Plaintiff's accident, and why Houghland, Welker, and Marlo all blamed Plaintiff for the accident. At its core, Mr. Darr's inquiry is thus aimed at revealing Mr. Koester's mental impressions and defense strategies

---

[9] Unlike fact work product, which is discoverable in rare cases where the party makes a substantial need showing, opinion work product remains protected even when such a showing is made. *See, e.g.*, *Appleton Papers Inc., v. EPA*, 702 F.3d 1018, 1023 (7th Cir 2012) (citing FED. RUL. CIV. PROC. 26(b)(3)(B) (stating that "[i]f the court orders discovery of those materials [fact work product], it must protect against disclosure of the mental impressions, conclusions and legal theories of a party's attorney or other representative concerning the litigation."); *see also Dawson v. New York Life Ins. Co.*, 901 F. Supp. 1362, 1368 (N.D. Ill. 1995).

regarding the case. This type of inquiry is clearly impermissible as it violates the boundaries of the intangible work product doctrine as set forth in *Hickman*.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Discovery to Adjudicate Claim of Attorney-Client Privilege is **DENIED**.

**IT IS SO ORDERED.**

**DATED: August 19, 2024.**

Digitally signed by Judge Sison
Date: 2024.08.19 09:15:46 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**